UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

FT. LAUDERDALE DIVISION

**NIGHT BOX
FILED**

FEB 28 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

| | |
|---|---|
| ANGOLA SHIPPING LTD., BAHAMAS<br>    Plaintiff, | |
| v. | |
| M/V "SUN ECLIPSE," its engines, tackle<br>appurtenances, etc., in rem, | CASE NO.: 00-6101-Civ-Huck<br>Magistrate Judge Stephen Brown |
|     Defendant,<br>v. | |
| HVIDE MARINE, INC.,<br>    Third Party Defendant. | |

## PLAINTIFF'S MOTION FOR EXTENSION OF TIME
## TO RESPOND TO DEFENDANT'S MOTION TO COMPEL
## DATED FEBRUARY 6, 2001

COMES NOW the Plaintiffs, ANGOLA SHIPPING LTD., BAHAMAS, by and through

its undersigned counsel, and pursuant to Federal Rules of Civil Procedure, 6(b), and moves for

an extension of time in which to respond to the Motion to Compel of Defendant, M/V SUN

ECLIPSE/Island Reef Holdings Limited, and as grounds thereof and in support thereof states and

avers as follows:

1.     This case involves an allision wherein the M/V Sun Eclipse struck the M/V

Angola while the Angola lay fast along side its berth at Port Everglades.

2.     On or about May 5, 2000, Plaintiff responded to Defendant's initial request for

production providing among other things all invoices and estimates associated with the allision,

copies of frame drawing, copies of the deck log, and a copy of the survey report with enclosures.

NON-COMPLIANCE OF S.D. fla. L.R. ___71.A.4___



00-6101-CIV-ZLOCH

3.      On August 9, 2000, Plaintiff filed its supplemental response to Defendant's initial request for production providing a copy of the provisional issue interim certificate of Lloyd's Registry and the Preliminary Report of James McCrory.

4.      Plaintiff's counsel has requested any additional information that may exist from his client, and will produce same upon receipt.  In addition, Plaintiff has produced in its second supplemental, response to request for production a statement of overtime of Maritime Procurement Services Limited; the actual invoices of Lloyd's Registry; the Listing of Surveys, Condition of Class and Memorandum; and, the credit memorandum to Charterers for off hire at Port Everglades.

5.      Plaintiff, request that it be given an additional thirty (30) days to compile any remaining documents which may exists or otherwise provide "better" responses to Defendant's request for production.

6.      Counsel for Plaintiff has conferred with counsel for Defendant, M/V Sun Eclipse and has been advised that counsel has no objection to this request for extension of time to respond to Defendant's Motion to Compel.

WHEREFORE, Plaintiff, M/V Angola, respectfully requests an extension of time of thirty (30) days in which to respond to Defendant's Motion to Compel by providing any additional documentation, if any, or otherwise respond to the motion.

2

00-6101-CIV-ZLOCH

LAW OFFICES OF MICHAEL F. GUILFORD, P.A.
Attorneys for PLAINTIFF
Suite 315, 8603 South Dixie Highway
Miami, Florida 33143
Telephone: (305) 668-3226
Facsimile: (305) 668-9866

By: _____
        MICHAEL F. GUILFORD
        Florida Bar Number 516066

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been sent via First Class U. S. Mail and Facsimile to:  **Allan R. Kelley, Esquire,** Fowler White Burnett Hurley Banick & Strickroot, P.A., 17th Floor, NationsBank Tower, 100 Southeast Second Street, Miami, Florida 33131 and **Jonathan W. Skipp, Esq.,** Horr, Novak & Skipp, P.A., Suite 1001, One Datran Center, 9100 South Dadeland Blvd., Miami, Florida 33156, on this 28th day of February , 2001.

LAW OFFICES OF MICHAEL F. GUILFORD, P.A.
Attorneys for PLAINTIFF
Suite 315, 8603 South Dixie Highway
Miami, Florida 33143
Telephone: (305) 668-3226
Facsimile: (305) 668-9866

By: _____
        MICHAEL F. GUILFORD
        **Florida Bar Number 516066**

2



NIGHT BOX
FILED

FEB 2 8 2001

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

LEWIS B. FREEMAN, as Receiver of                          CASE #:00-2013-CIV-HUCK/BROWN
Unique Gems Int'l Corp. and LUCY
MARTINEZ, individually and on behalf of
all others similarly situated,

                    Plaintiffs,

vs.                                                      **PLAINTIFF'S REPLY MEMORANDUM
                                                         IN SUPPORT OF**
FIRST UNION NATIONAL BANK, a                             **CLASS CERTIFICATION**
National Banking Association, and
HECTOR PONTE, an individual,

                    Defendants.
_____/

        Plaintiff, Lucy Martinez, individually and on behalf of those similarly situated, files this

Reply Memorandum in Support of her Motion for Class Certification and Incorporated

Memorandum of Law and states:

**I.      INTRODUCTION**

        First Union does not contest the assertions set forth in our Motion for Class Certification and

concedes that a class should be certified.  *See* First Unions Memorandum in Opposition at 2.

Essentially, First Union concedes that the all of the issues relating to its conduct as set forth in our

motion are common and should be treated on a class wide basis.  Nevertheless, First Union asserts

that it may now challenge the validity of the class judgment obtained against UGI in state court. First

Union reasons that this judgment is based upon fraudulent acts and therefore individual questions

preclude certification here.  First Union's position is factually and legally incorrect.  First Union's

-1-

position is also based upon a number of incorrect factual and legal presumptions.

## II.    FIRST UNION HAS NO SUBSTANTIVE RIGHT TO CHALLENGE THE JUDGMENT THAT PROVIDES THE CLASS RIGHTS AS CREDITORS

As a matter of substantive law, First Union has no right to contest the merits of the underlying judgment of the class against UGI. This position is contrary to law and common sense because the judgment[1] itself renders the class "creditors."

In order to bring an action seeking to remedy a fraudulent transfer the creditor must merely demonstrate that there was "a creditor to be defrauded." *See Huntsman Packaging Corp., v. Kerry Packaging Corp.*, 992 F.Supp. 1439 (M.D. Fla. 1998). Florida Statute section 726.102(4) defines a "creditor" as "a person who has a claim." Section 726.102(3) defines a "claim" as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured." Thus, although it is not necessary, a holder of a judgment is certainly a creditor for the purposes of a fraudulent transfer action. *See generally National Union Fire Ins. Co. of Pittsburgh, PA v. Grusky*, 763 So. 2d 1206, 1208 (Fla. 3d DCA 2000) (holder of a judgment "was a creditor for the purposes of an action predicated on chapter 726"). Thus, the issue is whether property was transferred that the class had a legal right to look to in satisfaction of their claim. *See generally Sneed v. Davis*, 184 So. 865 (Fla. 1938) (fraud on creditors may occur where creditor has a legal right to look for satisfaction of claim out of property disposed of). This issue has nothing to do with merits of the judgment holders'/creditors' claims against UGI. It merely relates to the existence of the judgment, not the

---

[1]There were three actions brought against UGI: An action by the Class Plaintiffs; an action by the Receiver; and an action by the Florida Attorney General. The Court treated the three actions as one. The Attorney General, on behalf of the consumers that formed the class here, obtained a judgment against UGI.

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400   Fax: (305) 476-7444

merits of underlying procedures.

Of course, First Union may test whether the underlying judgment is valid. *See Epstein v. Ferst*, 17 So. 414 (Fla. 1895) (holders of void judgement may not contest conveyance). This is a far cry, however, from relitigating an entire case. Understandably, First Union cites no authority for its position that it may challenge a valid judgment in its entirety. If First Union's position were accepted, it would be necessary to revisit the merits of every judgment that underlies a fraudulent transfer case. This position does not make sense, is contrary to law, and should be rejected.

For the reasons set forth above complete class certification is appropriate. Without question, the most analogous case is *Gutierrez v. Givens*, 989 F.Supp. 1033 (S.D. Cal. 1997). As we stated in our motion for class certification.

> In *Gutierrez v. Givens*, 989 F. Supp. 1033 (S.D. Cal. 1997), the court found that the common questions were predominate under similar facts. In *Gutierrez* the plaintiffs obtained a class action judgment against the promoter of a fraudulent scheme. The victims of the fraudulent scheme then brought an action in federal court against, *inter alia*, the promoter's attorneys and accountants for conspiracy and fraudulent transfer. The court in *Gutierrez* had little trouble certifying the class under those facts. It reasoned that:
>
>> If Defendants did in fact illegally hide … assets from judgment creditors, all class members would share identical claims against them … and this Court is faced with the same legal and factual questions for all proposed class members…. [C]ommon questions of law and fact predominate this action.
>
> Id. at 1045. *See also, Waters v. International Precious Metals Corp.*, 172 F.R.D. 479, 506 (S.D. Fla. 1996) (holding that UFTA claim would be certified for class action treatment).

In sum, First Union is flatly wrong. The class should be certified in its entirety.

-3-

III.    **FIRST UNION'S ASSERTION THAT THE UNDERLYING JUDGMENT IS BASED ENTIRELY ON FRAUD CLAIMS IS FACTUALLY INCORRECT**

Even if First Union were permitted to relitigate the entire underlying case, its contention that individual fraud issues are present is incorrect. The class members' status as creditors is predicated upon, *inter alia*, contract claims that do not require reliance.[2] Such claims were certified in the state court and can be certified here. *See* Class Certification Order of September 18, 1987 attached hereto as Exhibit "A."

IV.    **RES JUDICATA AND JUDICIAL ESTOPPEL PRECLUDE RELITIGATING OF THE MERITS OF THE UNDERLYING JUDGMENT**

The principals of res judicata, judicial estoppel and collateral estoppel preclude First Union from challenging the underlying judgment. First Union asserted a claim as a creditor in the underlying state court case.[3] First Union consented to, and sought the benefits of, those proceedings through the filing of its claim with the state court. First Union had an interest in precluding the claims of others to increase its potential recovery.

Res judicata bars First Union from attacking the validity of the underlying judgment. Res judicata refers to the "preclusive effect of a judgment in foreclosing relitigating of matters that were litigated or could have been litigated in an earlier suit." *I.A. Durbin, Inc. v. Jefferson Nat. Bank*, 793 F.2d 1541 (11th Cir. 1986). First Union as a claimant had ample opportunity to contest the state court proceedings. First Union also had ample motivation to contest the contract claims of the class members as competing creditors. First Union cannot now raise these issues for the first time.

---

[2] First Unions assertion that the claims that form the basis for the underlying judgement are tort based is misleading. *See* Memorandum in Opposition at 6. The claims as described in Plaintiff's memorandum are those asserted against First Union, not the litigation against UGI.

[3] In fact, First Union appeared through the very same counsel as it does in this litigation.

-4-

members as competing creditors. First Union cannot now raise these issues for the first time.

Contrary to First Union's assertions, the "thing sued for" and the "cause of action" were the same. In the state court the plaintiff class members sued for recovery of their deposits in, *inter alia*, contract. Recovery of those same funds is the thing sued for here. Moreover, the causes of action in the underlying state court class action are by definition identical to the causes of action that make the class members judgment creditors in this case. Thus, res judicata applies and bars First Union from relitigating the issues resolved by the underlying judgment.

In addition, judicial estoppel bars First Union's position. First Union cannot now contest the validity of the same proceedings to which it consented. *See Tavlvera v. School Board of Palm Beach Co.*, 129 F.3d 1214 (11th Cir. 1997) (doctrine of judicial estoppel bars parties from taking such inconsistent positions).

## V.     BECAUSE FLORIDA LAW APPLIES TO THIS CASE THERE ARE NO VARIATIONS IN LAW TO PRECLUDE CERTIFICATION

All of the significant activities in this case occurred in Florida. First Union's branch was in Florida. The deposits were made in Florida. The accounts of UGI with First Union were in Florida. The directives to transfer funds were made in Florida. The transfers were made from Florida. The matter was investigated and pursued by the Receiver and the Florida Attorney General in Florida. The underlying class action judgment is predicated upon Florida law. First Union's key employees and co-defendants committed the wrongful acts in Florida. UGI's offices and operations center was in Florida. The vast majority of class members reside in Florida. Nevertheless, First Union boldly asserts that because some class members reside outside of Florida and because UGI did some promotion outside of Florida, that the laws of numerous states must be applied. This is flatly wrong.

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

Florida applies the significant relationship test to choice of law issues. *See In re Air Crash Near Cali, Colombia on December 25, 1995*, 24 F.Supp.2d 1340, 1344 (S.D. Fla. 1998); *Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999, 1001 (Fla. 1980). The law of the state with the most significant relationship to the occurrence must be applied. The contacts to be considered in making this determination include: the place where the injury occurred; the place where the conduct causing the injury occurred; the place of incorporation and domicile of the parties; and, the place where the relationship between the parties is centered. *Cali*, 24 F.Supp.2d at 1345.

In this case there is no question that Florida Law applies. We believe that all of First Union's wrongful conduct with regard to transfer of funds originated and occurred in Florida.[4] The relationship between First Union and UGI was centered in Florida. All meetings and transactions occurred here. The injury (the fraudulent transfer of funds) occurred in Florida. Finally, Defendants and most class members are in Florida. The mere fact that some class members reside outside of Florida cannot outweigh the overwhelming relationship that this case has to Florida.

In sum, First Union is wrong. Florida law has been applied to every suit arising from the UGI scheme and it should be applied to this case. There are no variations in state law to raise predominance concerns.[5]

---

[4]As discussed extensively above, First Union should not be permitted to relitigate the underlying judgment. Nevertheless we note that because UGI's operations were wholly located in Florida, the relationship between class members and UGI was centered in Florida. Moreover, UGI's wrongful acts such as the failure to pay contractual sums due to class members occurred in Florida. The scheme that was presented in New York and Puerto Rico on the occasions described by First Union, was operated in Florida.

[5]Of course, even if it did become necessary to apply the law of New York of Puerto Rico and First Union suggests, certification would still be appropriate. The Court could easily create subclasses to deal with such variations. *See Simon v. Philip Morris Inc.*, 124 F.Supp.2d 46, 77 (E.D. N.Y. 2000) (collecting cases and describing the use of subclasses and other methods to deal with

-6-

## VI.    THE CLASS IS SUBJECT TO COMPLETE CERTIFICATION EVEN IF IT WERE NECESSARY TO RELITIGATE THE UNDERLYING JUDGMENT

Regardless of the obvious other infirmities of First Union's position, it is procedurally incorrect. A class may be easily certified regarding the validity of the underlying judgment. The individual reliance issue that forms the centerpiece of First Union's argument against certification does not exist. The class members' claims are predicated upon identical contracts. Reliance is simply not an issue in contract actions under Florida law, and thus, such claims may be certified. *See e.g., Shoma Development Corp. v. Vazquez*, 749 So.2d 1287 (Fla. 3DCA 2000).

Moreover, even if it were necessary to prove fraud, courts routinely certify classes in Ponzi schemes such as the one that underlies this case. For example in *Walco Investments, Inc. v. Kenneth Thenen*, (S.D. Fla. Case No. 93-2534) the court rejected the same arguments that First Union makes here:

> Finally, Plaintiffs argue that even if they do not have the <u>Affiliated Ute</u> and fraud-on-the-market presumptions, Defendants were involved in a single, common scheme or course of conduct, therefore, any issues of individual reliance on the securities claims are dwarfed by common questions of fact and law. As stated earlier, the Complaint here alleges that the Defendants, through their acts and omissions, were engaged in a common course of conduct to defraud the investors. (<u>See</u> Plaintiffs' Complaint, ¶'s 204-205). Thus, in order to succeed under Count III, the Plaintiffs and class members will have to prove the existence of this common fraudulent scheme. As a result of this alleged fraudulent scheme, there are numerous questions of law and fact common to the class with regard to the claims in Counts III through VII. Several courts, when confronted with single, common fraudulent schemes such as the one in the case at hand, have found that common questions predominate and that class certification is appropriate. <u>See</u> <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d at 724-25; <u>Kennedy v. Tallant</u>, 710 F.2d 711, 718 (11th Cir. 1983); <u>CV Reit, Inc. v. Levy</u>, 144 F.R.D. 690, 696 (S.D. Fla. 1992)(Gonzalez, J.); <u>Kreuzfeld, A.G. v. Carnehammar</u>, 138 F.R.D. at 602-03 (Paine, J.).

state law variations in the class context).

-7-

In the face of this abundance of common issues of both fact and law, Defendants argue that individual questions regarding reliance will predominate the securities claims.

\* \* \*

The existence of a few questions of individual reliance are <u>not</u> sufficient, on balance, to negate the predominance of common issues of fact and law present in this case. "Rule 23 does <u>not</u> require that all the questions of law and fact raised by the dispute be common." <u>Cox v. American Cast Iron Pipe Co.</u>, 784 F.2d at 1557 (emphasis added). On the contrary, Rule 23 just requires common issues to <u>predominate</u>, thereby logically implying that the existence of <u>some</u> individual issues will not destroy common issue predominance. In view of the overwhelming number of common factual and legal issues presented by Plaintiffs' securities claims in count III, the Court finds that questions of law and fact common to the class predominate over any questions affecting only individual members.

\* \* \*

[T]he "common scheme" or "common course of conduct" argument, made by Plaintiffs in support of the securities claims, is available here with regard to these fraud-based claims.

Order Granting Plaintiffs' Motion for Class Certification, \*33-35 (May 27th 1996), attached hereto as Exhibit "B." This same reasoning applies here. The UGI scheme involved a common course of conduct and is capable of class certification. *See* Order Granting Class Certification entered by the Miami-Dade County Circuit Court.

## VII.    VARIANT AMOUNTS OF DAMAGES DO NOT PRECLUDE CLASS CERTIFICATION

It is well settled that variation in the amount of damages does not preclude class certification. *See Morris v. Transouth Financial Corp.*, 175 F.R.D. 694, 700 (M.D. Ala. 1997) (although "computation of class damages would be mechanical without the necessity for individualized hearings . . . even if individualized fact specific inquiry was involved [courts still] 'routinely find Rule 23(b)(3)'s predominance requirement satisfied the need for individualized damage determinations when the 'fact' of injury is common.'"); *CV REIT, Inc. v. Levy*, 144 F.R.D. 690, 696

-8-

(S.D. Fla. 1992) ("Factual differences concerning treatment of damages will not defeat a finding of commonality.").

Moreover, in this case an aggregate damage award is possible. Aggregate damage awards are often entered in similar cases such as those involving securities fraud. *See e.g., Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980); see also Newberg on Class Actions §10 (3d ed. 1992) (aggregate damage awards are accepted). The presentation of aggregate class wide damages is particularly applicable in cases such as this where the damages are simply the subject of computation from the records of UGI. The "paradigmatic example [for the presentation of aggregate damages] is aggregate proof based on and inspection of the defendant's records of sales and transactions, which would obviously be the best evidence when compared to estimates of loss by individual class members." Newberg §10.02. In this case the receiver has already analyzed the UGI records for this purpose. First Union's assertion that this is a titanic undertaking is without merit.

In sum, proof damages in this case do not preclude class certification. It actually supports class certification because one offer of proof from the receiver would be much more efficient and accurate that thousands of class members presenting their own records.

**WHEREFORE**, Plaintiffs respectfully request that the Court enter an order:

(1)    certifying the class as defined above;

(2)    appointing the undersigned counsel as lead counsel for the class;

(3)    Directing class counsel to file a motion to approve the form and method of class notice within 20 days;

(4)    Providing any such further relief that the Court deems just and proper.

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

## CERTIFICATE OF SERVICE

We hereby certify that a true and correct copy of the foregoing was mailed to Stephen B. Gillman, Esq., Gallwey Gillman Curtis, Venton & Horn, P.A., Ocean Bank Bldg., #1100, 200 SE 1st ST, Miami FL 33131 and Gwendolyn Prothro, Esq, Steptoe & Johnson, LLP, 1330 Connecticut Ave., NW, Washington DC 20036; Robert C. Josefsberg, Esq., Podhurst, Orseck et al , 25 W. Flagler ST, City Nat'l Bank Bldg., #900, Miami FL 33130; Steven Mishan, Esq., Mishan, Sloto Greenberg, et al., 1st Union Financial Ctr, #2350, 200 S Biscayne Blvd, Miami FL 33131 and Scott A. Silver, Esq., Silver, Garvett & Henkel, P.A., Penthouse One, 1110 Brickell Ave, Miami FL 33131 on this 28th day of February, 2001.

> COLSON HICKS EIDSON
> 255 Aragon Avenue, 2ND Floor
> Coral Gables, Florida 33134
> (305) 476-7400
>
> By _____
>      Ervin A. Gonzalez
>      Florida Bar No.: 500720
>      Raymond W. Valori
>      Florida Bar No. 33200

**Colson Hicks Eidson**
255 Aragon Avenue, 2nd Floor, Coral Gables, Florida 33134-5008   Telephone: (305) 476-7400  Fax: (305) 476-7444

IN THE CIRCUIT COURT OF THE 11TH
JUDICIAL CIRCUIT IN AND FOR DADE
COUNTY, FLORIDA

GENERAL JURISDICTION DIVISION

CASE NO.: 97-5945 CA 02

LUCY MARTINEZ, individually and on
behalf of a class of persons similarly situated,

        Plaintiff,

vs.

UNIQUE GEMS INTERNATIONAL CORP.,
a Florida corporation a/k/a UGI, ENRIQUE
PIRELA, individually, CRISTINA CIPOLLETTI,
individually, and numerous JOHN DOES
and JOHN DOES, INC.,

        Defendants.

_____/

CRAIG PETRA, CHRISTIAN RIDAO,       CASE NO.: 97-6001 CA 30
PEDRO A. RODRIGUEZ, and ROSA
MOISES, on behalf of themselves
and others similarly situated,

        Plaintiffs,

vs.

UNIQUE GEMS INTERNATIONAL CORP.,
a Florida corporation a/k/a UGI,
ENRIQUE PIRELA, individually, and as
President of Unique Gems International
Corporation, CRISTINA CIPOLLETTI,
individually, and as Vice-President of Unique
Gems International Corporation,

        Defendants.

_____/

## ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

This matter came before the Court on the Plaintiffs' Motion for Class Certification

pursuant to Rule 1.220, Florida Rules of Civil Procedure. The Court, after reviewing the file,

hearing argument of counsel, and being otherwise duly advised in the premises does hereby,

1

CASE NO.: 97-5945 CA 02
CASE NO.: 97-6001 CA 30

ORDER AND ADJUDGE:

1.     The Plaintiffs' Motion for Class Certification pursuant to Rule 1.220, Florida Rules of Civil Procedure is hereby **GRANTED**.

2.     The Court relies, at least in part, on the Plaintiffs' Memorandum of Law in Support of their Motion for Certification of a Class pursuant to Fla.R.Civ.Pro. 1.220(d)(1) and the authorities cited therein.  More specifically, the Court finds that Class Certification is proper based upon the long standing Florida Supreme Court opinion in <u>Frankel v. City of Miami Beach</u>, 340 So. 2d 463 (Fla. 1977).

3.     In granting the Plaintiffs' Motion for Class Certification, the Court accepts the testimony of Lewis B. Freeman, Receiver of Unique Gems International and the testimony of the Class Representatives.  The Court further notes that the Receiver, and his counsel, do not object to Class Certification.  The Court also is advised that the Attorney General, through Assistant Attorney General Jody Collins, does not object to Class Certification.  Counsel for Defendant, Enrique Pirela, appeared at the class certification hearing but chose not to be heard. The Court has admitted and considered the Report of Receiver dated August 22, 1997 that establishes the existence of a ponzi scheme.

4.     The Court finds that the Notice to the Class members, which was sent via proof of claims forms and instruction sheets by the Receiver, is sufficient notice to the Class members to satisfy Rule 1.220, Florida Rules of Civil Procedure in this limited fund case.

CASE NO.: 97-5945 CA 02
CASE NO.: 97-6001 CA 30

5.    The following law firms are hereby appointed class counsel: Robles & Gonzalez,

P.A.; Delgado, Gefler, Starkman & Magolnick, P.A.; Silva & Silva, P.A.; Gonzalo Dorta,

P.A.; and Tew & Beasley, P.A.

DONE AND ORDERED in chambers this ___ day of September, 1997 at Miami, Dade

County, Florida.

HONORABLE BERNARD S. SHAPIRO,
CIRCUIT COURT JUDGE

Copies furnished to:
All Counsel of Record

Conformed Copy

SEP 1 8 1997

Bernard S. Shapiro
Circuit Court Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 93-2534-CIV-MORENO

WALCO INVESTMENTS, INC. et. al.,

    Plaintiffs,

vs.

KENNETH THENEN, et. al.,

    Defendants.

_____/



FILED by _____ D.C.

JUN 2 7 1996

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

## ORDER GRANTING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

THIS CAUSE came before the Court upon Plaintiffs' Motion for Class Certification (docket no. 620), filed on March 20, 1995.

THE COURT has considered the motion, responses, reply, the oral argument of counsel at the hearing held on November 17, 1995, and all pertinent portions of the record, and being otherwise fully advised in the premises, it is

ADJUDGED that Plaintiffs' Motion for Class Certification is GRANTED.

### FACTUAL BACKGROUND

Plaintiffs and the class of investors that they are seeking to represent all purchased securities in Premium Sales Corporation ("Premium"). Premium was founded by Defendants Kenneth Thenen ("Thenen") and Daniel Morris ("Morris") in 1986. Both Thenen and Morris had histories of failed business ventures prior to founding Premium. Premium was supposedly in the "grocery diverting" business, which involves the practice of buying large quantities of grocery items at discounts offered in limited geographical areas and then reselling these same products at a large profit in other geographical areas where such discounts are not available. Besides

Insider Defendants such as Thenen and Morris, Premium's diverting business involved a number of different players. The diverting deals were allegedly arranged and confirmed by the Grocer Defendants. (See Plaintiffs' Complaint, ¶'s 81-91).. The necessary money was raised through the sale of securities. The securities were sold through various offerings in partnerships and other entities ("Funding Entities") established by Promoters, all of which existed to channel investors' funds to support the business activities of Premium. (See Plaintiffs' Complaint, ¶'s 20-80). These limited partnership offerings were prepared and issued by the Law Firm Defendants. (See Plaintiffs' Complaint, ¶'s 123-125). Finally, all of Premium's accounts were held and maintained by the Banking Defendants. (See Plaintiffs' Complaint, ¶'s 92-122).

According to the Plaintiffs and class members, what seemed to them at first to be a safe and prosperous venture turned out to be nothing more than a "Ponzi scheme." In executing this alleged scheme, investors' capital was not used to fund any legitimate business, but rather was simply paid out by Defendants to themselves and to other investors, with Defendants falsely characterizing the funds as returns or profits on investments. As a result of this alleged fraudulent scheme, Plaintiffs brought this class action lawsuit against over 100 individuals and entities for the events that led to the collapse of their multi-million dollar investment.

The named Plaintiffs, Walco Investments, Inc., PHK Limited Partnership, Burleigh Corporation, Robert E. Shack, Eleanor Shack,

2

Robert E. Shack, P.A., Palmer Hughes, Abraham Woidislawsky, Rita Woidislawsky, Claire Warren and Joe Sklar (collectively, "Plaintiffs"), seek certification of a single class of investors as well as five (5) different subclasses of particular investors. The following list illustrates who the Plaintiffs are seeking to represent:

1) All Plaintiffs seek to represent a class consisting of all persons who purchased interests in or who otherwise invested in or through the Funding Entities to prosecute Counts III, IV, V, VI, VII, VIII, IX, and X (the **"Global Class"**);

Additionally, for purposes of Counts I and II, under Sections 12(1), 12(2) and 15 of the Securities Act, Plaintiffs seek certification of the following subclasses:

2) Plaintiffs Walco Investments, Inc., PHK Limited Partnership and Burleigh Corporation seek to represent all members of the Global Class who bought interests in or otherwise invested in or through the Deckelbaum Funding Entities (the **"Deckelbaum Subclass"**);

3) Plaintiffs Robert E. Shack, Eleanor Shack, Robert E. Shack, P.A. and Palmer Hughes seek to represent all members of the Global Class who bought interests in or otherwise invested in or through the Sazant Funding Entities (the **"Sazant Subclass"**);

4) Plaintiff Claire Warren seeks to represent all members of the Global Class who bought interests in or otherwise invested in or through the Stern/Lipson Funding Entities (the **"Stern/Lipson Subclass"**);

3

Grocers, the Law Firms and the Banks all played a central role in making this Ponzi scheme work. Plaintiffs claim that the scheme could not have worked without the participation of every one of the Defendants. Plaintiffs thus argue that class certification is in the interest of justice, because it will facilitate the efficient enforcement of rights and will conserve judicial resources by enabling the scheme that lies at the heart of this case to be proven once, instead of numerous times by individual litigants proceeding on their own.

Several Defendants filed responses in opposition to Plaintiffs' Motion for Class Certification. Although these responses in opposition were filed separately, the arguments made against certification were very similar. The main argument cited by the Defendants against certification of the class and subclasses is that common questions of law or fact do not predominate over individual issues. In order to determine whether class certification of this litigation is appropriate, the Court must decide whether Plaintiffs have met all of the requirements set out in Rule 23 of the Federal Rules of Civil Procedure.

## LEGAL STANDARD AND REQUIREMENTS OF RULE 23

The party seeking to certify an action as a class action bears the burden of proof on all certification issues. See Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d 1030, 1038 (5th Cir. 1981). Under Rule 23(a) of the Federal Rules of Civil Procedure, Plaintiffs must first satisfy all of the following requirements before a class can be certified:

5

1.    The class must be so _numerous_ that joinder of all members is impracticable ("numerosity");

2.    There must be questions of fact or law _common_ to the class ("commonality");

3.    The claims (or defenses) of the representative parties must be _typical_ of the claims (or defenses) of the class ("typicality"); and

4.    The representative parties must _fairly_ and _adequately_ protect the interests of the class ("adequacy").

In addition to meeting the four preliminary requirements in subdivision (a), Plaintiffs must then satisfy one of the elements of Rule 23(b) in order for the action to be maintained as a class action.   In the instant case, Plaintiffs are seeking to certify the class under Rule 23(b)(3) which requires that the Court find: **(i)** that questions of law or fact common to the members of the class predominate over questions affecting only individual members, and **(ii)** that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.[2]   The predominance and superiority elements of Rule 23(b)(3) are indicative of this subdivision's emphasis on economy, efficiency

---

[2]Besides satisfying all of the general prerequisites to class actions set out in Rule 23(a), actions brought under Rule 23(b)(3) are subject to the special provisions in subdivision (c)(2) requiring that notice be given to all class members of the institution of the action, their right to appear in it by counsel, and their option to exclude themselves from the class under Rule 23(c)(2)(A). See Rule 23 of the Federal Rules of Civil Procedure; See 7A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure*: Civil § 1777 at p.520 (1986).

6

and procedural superiority.  Once the requirements of Rule 23(a) and 23(b) are met, a Court must certify the lawsuit in question as a class action.

Furthermore, Rule 23(c)(4) states that when appropriate, a class may be divided into subclasses with each subclass treated as a separate class.  This means that each of the subclasses must independently meet the requirements of Rule 23 for maintenance of a class action. See 7B Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure*: Civil § 1790 (1986).  A failure to meet any of the requirements set out in Rule 23 will result in the Court denying certification of a subclass.

Generally, Rule 23 is liberally construed in order to meet its objectives.  The District Court thus has broad discretion in determining whether a particular action complies with the requirements of Rule 23. See Weathers v. Peters Realty Corp., 499 F.2d 1197, 1200 (6th Cir. 1974); See also Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d at 1038.  However, the Court must not exercise its discretion in a manner that would undermine the policies underlying class actions. Weathers v. Peters Realty Corp., 499 F.2d at 1200.  Moreover, and most importantly, in determining whether to certify a class, the Court is not to examine the underlying merits of the claims. See Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177-78 (1974); See also Cox v. American Cast Iron Pipe Co., 784 F.2d 1546, 1557 (11th Cir. 1986), *cert. denied*, 479 U.S. 883 (1986).  The United States Supreme Court noted in Eisen that, "`in determining the propriety of a class action, the

7

question is not whether the ... plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met.'" Eisen v. Carlisle & Jacquelin, 417 U.S. at 178 (quoting with approval Miller v. Mackey International, Inc., 452 F.2d 424, 429 (5th Cir. 1971)).

### LEGAL ANALYSIS

As stated above, Plaintiffs are seeking to certify a Global Class as well several subclasses. The requirements of Rule 23 as they apply to the Global Class and the subclasses will be analyzed separately.

I. GLOBAL CLASS. Plaintiffs seek to certify a class consisting of all persons who purchased interests in or through the Funding Entities to prosecute Counts III, IV, V, VI, VII, VIII, IX, and X. (the "Global Class").[3]  The Court finds that all of the requirements of Rule 23(a) and Rule 23(b)(3) are met with respect to the Global Class:

### Numerosity

Rule 23(a)(1) requires that the class be so numerous that joinder of all members is impracticable. The question of whether Rule 23(a)(1) has been satisfied depends on the facts of each case. Impracticability, also referred to as numerosity, does not mean "impossibility." See 7A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure*: Civil § 1762 at p.159

---

[3]Excluded from the Global Class are Premium, the Defendants, their subsidiaries and affiliates, other officers of Premium, members of the immediate family of each Defendant, and the legal representatives, heirs, successors or assigns of any of the Defendants.

(1986). Several factors must be considered by a District Court when determining whether joinder of all of the members is impracticable.

The most obvious and most important factor of all is the size of the class. Although a plaintiff need not show the precise number and identity of class members, mere speculation as to the number of parties involved and general allegations of numerosity are insufficient to satisfy Rule 23(a)(1). See Evans v. U.S. Pipe & Foundry Co., 696 F.2d 925 (11th Cir. 1983). In order to satisfy this prerequisite, a plaintiff must ordinarily demonstrate some evidence or reasonable estimate of the number of purported class members. See Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d at 1038; See also Kreuzfeld A.G. v. Carnehammar, 138 F.R.D. 594, 599 (S.D. Fla. 1991)(there exists no definite standard as to the size a given class must attain in order to satisfy Rule 23(a)(1). The number of class members alone, however, is not the determinative factor under Rule 23(a)(1). Since the proper focus under Rule 23(a)(1) is on whether joinder of all members is practicable in view of the numerosity of the class, courts must take other factors into consideration, such as the geographic diversity of the class members, the nature of the action, the size of each plaintiff's claim, judicial economy and the inconvenience of trying individual lawsuits, and the ability of the individual class members to institute individual lawsuits. See Zeidman v. J. Ray McDermott & Co., Inc., 651 F.2d at 1038; See also Kreuzfeld A.G. v. Carnehammar, 138 F.R.D. at 599. Therefore, all of these factors

9

must be considered by the Court in determining whether impracticability exists.

Plaintiffs allege in their Fourth Amended and Consolidated Class Action Complaint that more than 1,500 class members invested approximately $550 million in the Premium fraud. (See Plaintiffs' Complaint, ¶ 171). As stated above, however, the size of the class should not be utilized as the determinative factor in deciding whether Rule 23(a)(1) has been met. In addition to the large number of members here, the class is also geographically dispersed across the United States and Canada. For example, the named Plaintiffs are citizens of Florida (Walco, Warren, Hughes and the Shack Plaintiffs), Delaware (PHK and Burleigh), Pennsylvania (Mr. and Mrs. Woidislawsky), and Canada (Sklar). (See Plaintiffs' Complaint, ¶'s 6-13). The size and geographical diversity of the class renders joinder of all members impracticable. See Allen v. Isaac, 99 F.R.D. 45 (N.D. Ill. 1983)(although the class of 17 black employees was not large, geographic dispersion across the United States rendered their joinder impracticable); See also Gentry v. C & D Oil Co., Inc., 102 F.R.D. 490 (W.D. Ark. 1984)(joinder was impracticable where potential class members were located throughout a number of counties in both Arkansas and Missouri). In addition to the inexpediency of their joinder, it would be extremely inconvenient and a waste of valuable judicial resources to try several hundred individual lawsuits. For these reasons, the Court finds that the numerosity requirement of Rule 23(a)(1) has been met.

## Commonality

The second prerequisite of Rule 23(a) requires that there be questions of law or fact common to the class.[4]  This prerequisite does not require that <u>all</u> of the questions of law or fact raised by the case be common to all the plaintiffs. <u>See</u> <u>Cox v. American Cast Iron Pipe Co.</u>, 784 F.2d at 1557; <u>See also</u> <u>Haitian Refugee Center, Inc. v. Nelson</u>, 694 F.Supp. 864, 877 (S.D. Fla. 1988), *affirmed*, 872 F.2d 1555 (11th Cir. 1989).  Furthermore, Rule 23(a)(2) does not establish any quantitative or qualitative test of commonality. <u>See</u> 7A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure*: Civil § 1763 at p.198 (1986)(all that can be divined from the rule itself is that the use of the plural "questions" suggests that more than one issue of law or fact must be common to members of the class).  Many courts, however, have held that where a common scheme of deceptive conduct is alleged, common questions of law and/or fact will exist. <u>See</u> <u>Green v. Wolf Corporation</u>, 406 F.2d 291, 298 (2nd Cir. 1968); <u>See</u> <u>Powers v. Stuart-James Co., Inc</u>, 707 F.Supp. 499, 502 (M.D. Fla. 1989); <u>See also</u> <u>Haitian Refugee Center, Inc. v. Nelson</u>, 694 F.Supp. at 877;

---

[4]The Court recognizes the similarities between the common-issue requirement in 23(a)(2) and the requirement in 23(b)(3) regarding whether common questions predominate.  A few courts in actions such as this one brought under 23(b)(3), have not drawn a distinction between the two requirements.  These courts have chosen to deal with both requirements simultaneously, because (a)(2) is normally satisfied anytime courts find that the more stringent standard in (b)(3) has been met. <u>See</u> 7A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure*: Civil § 1763 at p.227 (1986).  Despite the similarities between the two elements, the Court here will analyze them separately.

Cf. <u>Turner v. First Wisconsin Mortgage Trust, et al.</u>, 454 F.Supp. 899 (E.D. Wis. 1978)(the mere allegation of a common course of misconduct, without reference in the complaint to the particularities of the misconduct, is insufficient to satisfy the commonality requirement).

The Court finds that the commonality requirement of 23(a)(2) has been met by Plaintiffs. While it may be true, as noted by Defendants Henry Weitzman and Leslie Weitzman in their memorandum of law in opposition to Plaintiffs' Motion for Class Certification, that unique defenses will be asserted by the Defendants in this action, this fact alone is insufficient to destroy the commonality requirement. As stated above, the commonality prerequisite does not require that <u>all</u> of the questions of law and/or fact be common. See <u>Cox v. American Cast Iron Pipe Co.</u>, 784 F.2d at 1557; <u>See also Haitian Refugee Center, Inc. v. Nelson</u>, 694 F.Supp. at 877; <u>See also Powers v. Stuart-James Co., Inc.</u>, 707 F.Supp. at 502 (holding that individual issues did not outweigh substantial common questions). Plaintiffs here allege throughout their Complaint that this action is the result of a unified scheme to defraud investors. Where such allegations are made, common questions are usually found. See <u>Green v. Wolf Corporation</u>, 406 F.2d at 298; <u>See also Kornick, et al. v. Talley, et al.</u>, 86 F.R.D. 715, 719-20 (N.D. Ga. 1980)(allegations that corporation and its former officers and directors engaged in common course of conduct to defraud investors and that they omitted material facts from financial statements was sufficient to satisfy commonality requirement). The Court agrees

12

with Plaintiffs that there exists a substantial number of questions of fact and law common to the class.  For example, as to Counts III through VII, there are several common questions:

* Whether the Premium fraud operated as alleged in the Complaint;

* Whether the Insider Defendants had the checkered pasts attributed to them in the Complaint, and whether they failed to reveal those facts to the investors;

* Whether the interests purchased by class members were securities which should have been registered under federal or state securities laws;

* Whether the offering documents omitted material information regarding the Premium Corporations, their principals, and their operations;

* Whether the liability of the Insider Defendants, the General Partner Defendants, and the Promoter Defendants can be established under § 20a of the Exchange Act; and

* Whether the Plaintiffs were damaged thereby.

Furthermore, as to Counts VII, VIII, IX and X, the following questions are common to the Global Class:

* Whether federal and state RICO requirements are met;

* Whether there was fraud, and whether the Defendants committed it; and

* Whether Plaintiffs were damaged thereby.

In conclusion, the Court finds that the commonality requirement of 23(a)(2) is met because there are a substantial number of questions of fact and law that are common to the Global Class.  The Court does not overlook the fact that there may be some individual issues in this action.  However, these individual issues do not outweigh the substantial number of common questions.  The

13

issue of common question predominance will be revisited below, in the Court's analysis of Rule 23(b)(3).

### Typicality

Under this third requirement of Rule 23(a), the named Plaintiffs must present claims that are typical of the claims of the class. The named Plaintiffs' claims are typical if they stem from the same event, practice, or course of conduct that forms the basis of the class claims and are based upon the same legal or remedial theory. See Jordan v. County of Los Angeles, 669 F.2d 1311, 1321 (9th Cir. 1982). Proof of typicality requires more than general conclusory allegations. See Belles v. Schweiker, 720 F.2d 509, 515 (8th Cir. 1983). To meet the typicality requirement, the named Plaintiffs must demonstrate that the members of the class have the same or similar grievances as themselves. Id. In other words, the named representatives must be able to establish the bulk of the elements of each class members' claims when they prove their own claims. See General Telephone Company Of Southwest v. Falcon, 457 U.S. 147 (1982). The named Plaintiffs' claims thus have to be grounded in factual situations similar to those of the class members. Any atypicality or conflict between the named Plaintiffs' claims and those of the Class "must be clear and must be such that the interests of the class are placed in significant jeopardy." Sley v. Jamaica Water & Utilities, Inc., 77 F.R.D. 391, 394-95 (E.D. Pa. 1977).

In the instant case, the Court finds that the named Plaintiffs have met the typicality requirement. The Fourth Amended and

14

Consolidated Class Action Complaint indicates that the named
Plaintiffs and each member of the proposed Global Class were
injured by purchasing interests in or investing through the Funding
Entities.   Everyone involved lost their money as a result of the
Premium Ponzi scheme.   Thus, in order to succeed on the merits,
each named Plaintiff will have to prove the entire case (i.e., the
existence of the Ponzi scheme) on behalf of all members of the
class.  Accordingly, the named Plaintiffs have appropriately
asserted the same claims based upon the same legal theories on
behalf of themselves as well as all of the Class members.

     Defendant Malone & Hyde, Inc., argues that the purported class
representatives' claims are atypical of those of the alleged class
because: (1) the named Plaintiffs' deposition testimony about
reliance differs from the allegations of reliance in the Complaint
on behalf of the Class; and (2) the named Plaintiffs invested in
different Funding Entities based on different offering documents
and agreements.  At this time, the Court will not address Malone &
Hyde's first objection based on the differing types of reliance, as
this objection is better dealt with below under the Court's
analysis of the predominance of individual versus class issues
pursuant to Rule 23(b)(3).

     The Court, however, rejects Malone & Hyde's second argument
regarding the named Plaintiffs' varying investment decisions.
Minor "`[f]actual differences will not render a claim atypical if
the claim arises from the same event or practice or course of
conduct that gives rise to the claims of the class members, and if

15

it is based on the same legal theory.'" <u>Hoxworth v. Blinder,
Robinson & Co., Inc.</u>, 980 F.2d 912, 923 (3rd Cir. 1992)(quoting
<u>Gratsy v. Amalgamated Clothing & Textile Workers Union</u>, 828 F.2d
123 (3rd Cir. 1987), *cert. denied*, 484 U.S. 1042 (1988)). Although
it is true that the named Plaintiffs invested in different Funding
Entities based on different offering documents, the Complaint here
alleges a unified fraudulent scheme which was accomplished through
an unregistered integrated offering of securities and falsified
diverting transactions, and which caused them each to suffer
financial losses. This unified scheme is alleged to have been made
possible primarily because of the material omissions regarding
Morris and Thenen's shady and checkered financial backgrounds. All
of the Defendants, including the Funding Entities, are alleged to
have been a crucial part of this concerted fraudulent scheme even
though the named Plaintiffs did not deal directly with each of the
Defendants. Each of the named Plaintiffs will have to establish
the existence of this alleged Ponzi scheme in order to prove his
case. Thus, typicality is not destroyed where, as is the case
here, the named Plaintiffs' claims arise from the same event or
course of conduct that gives rise to the claims of the class
members. <u>See</u> <u>Hoxworth v. Blinder, Robinson & Co., Inc.</u>, 980 F.2d at
923; <u>Jordan v. County of Los Angeles</u>, 669 F.2d at 1321; <u>Roberts v.
Heim</u>, 670 F.Supp. 1466, 1490-91 (N.D. Cal. 1987)(holding that under
the <u>La Mar</u> exception, the typicality requirement was met even
though the named plaintiffs did not deal directly with all
defendants, because plaintiffs alleged both a conspiracy and a

16

concerted scheme); <u>Longden v. Sunderman</u>, 123 F.R.D. 547, 556-57 (N.D. Tex. 1988)(individual factual differences will not defeat class certification where plaintiffs have alleged a continuous course of conduct by the defendants which is uniformly fraudulent). For this reason, the Court finds that the named Plaintiffs have met their burden of establishing that their claims are typical of the claims of the class.

### Fair and Adequate Representation

The final prerequisite of Rule 23(a) requires a showing that the representative parties will fairly and adequately protect the interests of the class. What constitutes adequate representation is a question of fact which depends upon the circumstances of each case and is entrusted to the discretion of the trial court. <u>See</u> 7A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice and Procedure*: Civil § 1765 at p.271 (1986); <u>See</u> <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d 718, 728 (11th Cir. 1987); <u>See</u> <u>Schatzman v. Talley</u>, 91 F.R.D. 270, 272 (N.D. Ga. 1981). Generally, however, the adequacy of the representation depends on two factors: (1) the named Plaintiffs must appear to be able to prosecute the action vigorously through qualified, experienced and competent counsel, and (2) the named Plaintiffs must not have interests antagonistic to those of the class. <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d at 726; <u>Powers v. Stuart-James Co., Inc.</u>, 707 F.Supp. at 503; <u>Weinberger v. Jackson</u>, 102 F.R.D. 839, 844-45 (N.D. Cal. 1984).

Defendants do not dispute the qualifications and competence of

Plaintiffs' counsel.  The Court notes that Plaintiffs' counsel are experienced in securities litigation and have successfully prosecuted numerous securities cases in courts throughout the United States and in this District.  The Court further notes that the experience and competency of Plaintiffs' counsel in securities litigation is evident in both their pleadings and oral presentations to the Court.  However, Defendant Malone & Hyde argues that several of the named Plaintiffs are inadequate representatives because they lack sufficient knowledge of the facts alleged in the Complaint.  Specifically, Malone & Hyde notes that several of the named Plaintiffs have testified that they have no knowledge of their claims against the Grocer Defendants, they have no knowledge of the case itself, and they have no knowledge of the identities of the parties. (See Malone & Hyde's Response, p.20-21). The Court notes that such a lack of knowledge by some of the named Plaintiffs is understandable given the complexity of this case. See Wolgin v. Magic Marker Corp., 82 F.R.D. 168, 174-75 (E.D. Pa. 1979)(in complex securities case, putative class representative need not and usually will not have personal knowledge of the facts of the case).  Thus, the Court finds that such a common and expected lack of knowledge by some of the named Plaintiffs does not render them inadequate representatives. See Lewis v. Curtis, 671 F.2d 779, 789 (3rd Cir. 1982)(class representatives are not required to have a detailed knowledge of the litigation), *cert. denied*, 459 U.S. 880 (1982).

In addition, Defendant Pueblo argues that Plaintiffs Palmer

18

Hughes, Claire Warren and Abraham Woidislawsky will not represent the potential class with sufficient vigor because they are not prepared to provide adequate financial representation for the class. Specifically, Pueblo notes that these named Plaintiffs may not be able to pay the costs of bringing this action. Plaintiffs' counter by arguing that the named representatives are only liable for their pro rata share and that costs may be made contingent on the outcome of the litigation. See Rand v. Monsato, 926 F.2d 596, 599 (7th Cir. 1991). The Court notes that while the named Plaintiffs bear the ultimate responsibility for the costs of this litigation, these costs may be advanced by counsel. Plaintiffs' counsel have agreed to advance the costs of this litigation. (See Plaintiffs' Reply Brief, p. 36-37). Therefore, because counsel have agreed to advance the costs, the Court finds that Plaintiffs Hughes, Warren and Woidislawsky are not inadequate representatives. See Randle v. Spectran, 129 F.R.D. 386, 392 (D. Mass. 1988)(finding that plaintiff was an adequate representative where fellow representatives were able to assist her and counsel agreed to advance the costs of litigation).

The Grocer Defendants also argue that several of the named Plaintiffs have interests that are antagonistic to those of the rest of the class. The Court disagrees. For example, Defendants claim that Plaintiff Walco Investments, Inc., has interests antagonistic to the class because its president, Phil Bell, invested in a company called Grossmarkt Investments, Ltd., a company that has been named as a Defendant in this action. This

fact alone is not sufficient to support a finding that Walco is not an adequate class representative. Mr. Bell invested in Grossmarkt as an individual. Walco never invested in Grossmarkt·and it is Walco who happens to be the class representative here. For this reason, the Court finds that Mr. Bell's involvement with Grossmarkt does not detract from Walco's ability to serve as a class representative.

The Grocers further argue that PHK Limited Partnership is an inadequate representative because its representative, Jeff Chodorow, is a Defendant in this action and is presently under federal indictment. Besides the obvious fact that it is PHK that is named as the class representative and not Mr. Chodorow, the Court notes that persons indicted or convicted of crimes may be adequate class representatives. See Randle v. Spectran, 129 F.R.D. at 392. Finally, Pueblo argues that the Shack Plaintiffs also have interests antagonistic to the class because they actually profited from the Premium fraud.[5] Plaintiffs correctly point out that Pueblo provides absolutely no support for its contention that the Shacks are profiteers in the Premium fraud. Even if there were such proof, the Court feels that this is an inappropriate stage of the proceedings to determine whether or not the Shack Plaintiffs were profiteers.

---

[5]Pueblo has repeatedly argued in prior pleadings and at almost every proceeding in this litigation about conflicts and improper conduct by the Funding Entities and Insider Defendants which have settled with the Plaintiffs. The Court has found no evidence of any violation of Dosdourian v. Carsten, 624 So.2d 241 (Fla. 1993).

In conclusion, the Court finds that there are no antagonistic interests and that the named Plaintiffs will fairly and adequately protect the interests of the class. The named Plaintiffs are a cross section of Premium investors with investments ranging in size from $100,000 to over $2 million, and include investors from each of the major Funding Entities. Both the named Plaintiffs and the other class members lost their investments as a result of the alleged Premium Ponzi scheme. For each of the named Plaintiffs to succeed in their claims, they will have to prove matters that are common with the claims of the entire class, including the nature of the investments, the material misrepresentations and omissions, the fraudulent Grocer transactions and the resultant losses sustained. In other words, in order to recover in this action every investor would basically have to prove the existence of the Ponzi scheme. The named Plaintiffs and the class members thus share the common objective of establishing Defendants' liability and maximizing the recovery so that they can get as much of their investments back as possible. Therefore, since they share the same interests, it is clear that the named Plaintiffs will pursue this case vigorously on behalf of themselves as well as all of the class members.

### Rule 23(b)

Having determined that the Plaintiffs' have met the four prerequisites of 23(a), the class must still qualify under one of the three provisions of Rule 23(b) in order to be certified. In this action, Plaintiffs seek certification under Rule 23(b). Rule 23(b) sets out two requirements for the maintenance of a class

21

action: (i) questions of law or fact common to the members of the class must predominate over any questions affecting only individual members; and (ii) a class action must be superior· to other available methods for the fair and efficient adjudication of the controversy at hand.    The Court addresses each of these requirements below.

### Predominance

The Court must first find that common issues of law or fact predominate over individual issues.    Several of the Defendants argue that the Rule 23(b)(3) requirement is not met here because individual issues will predominate over issues common to the class. Specifically, Defendants claim that individual questions of reliance predominate as to Plaintiffs' securities, RICO, and common law fraud claims.    As a result, Defendants argue that the Global Class should not be certified as to these specific claims.    The Court will analyze each of these respective claims separately. However, before addressing these claims, the Court must resolve the parties' dispute regarding the Eisen doctrine.

### Eisen Doctrine

As stated earlier, the Eisen Doctrine stands for the proposition that in determining whether to certify a class, a Court cannot examine the underlying merits of the claims. Eisen v. Carlisle & Jacquelin, 417 U.S. at 177-78.    Therefore, generally under the Eisen doctrine, the only matters pertinent to a Court's determination of a motion for class certification pursuant to Rule 23 are the requirements of the Rule itself, and the factual

22

allegations of the complaint, which must be accepted as true. Blackie v. Barrack, 524 F.2d 891, 901 n. 17 (9th Cir. 1975), *cert denied*, 429 U.S. 816 (1976). Plaintiffs argue that it would be improper under the Eisen doctrine for the Court to "delve" into the merits of Plaintiffs' reliance when resolving Plaintiffs' Motion for Class Certification. Defendants counter by noting that the Eleventh Circuit has limited the Eisen doctrine.

The Eleventh Circuit has indicated that "[w]hile it is true that a trial court may not properly reach the merits of a claim when determining whether class certification is warranted," the principles of Eisen should not be, "talismanically invoked to artificially limit a trial court's examination of the factors necessary to a reasoned determination of whether a plaintiff has met her burden of establishing each of the Rule 23 class action requirements." Love v. Turlington, 733 F.2d 1562, 1564 (11th Cir. 1984); See also Nelson v. United States Steel Corp., 709 F.2d 675, 679-80 (11th Cir. 1983). Even in Kirkpatrick, cited by Plaintiffs' in support of their narrow interpretation of the Eisen doctrine, the Eleventh Circuit recognized that courts "may look beyond the allegations of the complaint in determining whether a motion for class certification should be granted." Kirkpatrick v. J.C. Bradford & Co., 827 F.2d at 722.

The Court here agrees with the Defendants' interpretation of the present state of the Eisen doctrine. In view of the evolving nature of the Eisen doctrine in this Circuit, the Court cannot simply just look to the allegations in the Complaint as Plaintiffs

suggest.  Thus, the Court has, in a limited manner, looked beyond the Complaint in order to determine whether individual issues of reliance will predominate in this action over questions common to the class.  In doing so the Court does not be "delve" into the merits of Plaintiffs' proof of reliance.  Specifically, the Court does not assess the Plaintiffs' likelihood of success on the claims, as the district court improperly did in Kirkpatrick.  See Kirkpatrick v. J.C. Bradford & Co., 827 F.2d at 722-23 (finding that the trial court's rejection of the fraud-on-the-market theory and subsequent denial of class certification was improperly based on nothing other than the court's assessment of the plaintiffs' likelihood of success on the claims).  The Court is not determining that Plaintiffs' claims of reliance lack evidentiary support, or that they are likely to be unsuccessful, etc.  Such an assessment of the validity of Plaintiffs' proof of reliance would be a clear violation of the Eisen doctrine.  Instead, the Court looks beyond the allegations in the complaint, at some of the named Plaintiffs' depositions for example, in order to determine whether individual questions of reliance will predominate in this action over issues of law or fact common to the class.  Id. at 723 (consideration of the deposition of a named plaintiff to determine whether Rule 23(a)'s requirements have been met is not improper).  In making this determination, however, the Court does not violate the Eisen doctrine by getting into the merits of Plaintiffs' claims.

24

## SECURITIES CLAIMS

Count III of Plaintiffs' Complaint seeks certification of a Global Class to pursue a claim under Section 10b of the Securities Exchange Act and Rule 10b-5 against the Insider Defendants, the Funding Entity Defendants, the General Partner Defendants and the Promoter Defendants. The Court notes that the only opposition of such a class comes from the Weitzmans and the Sazant Funding Entities.[6] Plaintiffs assert two theories under which they claim that they are entitled to a class-wide presumption of reliance. First, Plaintiffs contend that their claims concern primarily acts of omission, thereby necessitating a finding that reliance on the part of the individual class members is presumed under the rule of Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1975). Secondly, Plaintiffs argue that they are entitled to a class-wide presumption of reliance because the fraud at issue in this case was the only thing that created the market for Premium securities (i.e., "the fraud-on-the-market theory"). Ross v. Bank South, N.A., 885 F.2d 723 (11th Cir. 1989), cert. denied, 495 U.S.

---

[6]The Sazant Funding Entities do not address the reliance issue in their response. Instead, they argue that class certification of Counts III through VII should be denied or further subclassed because of a conflict within the class regarding how damages are to be distributed among the class if this litigation is successful. The Court disagrees with the Sazant Defendants. Disagreements about the distribution of damage awards do not require creation of subclasses or preclude class certification. See Blackie v. Barrack, 524 F.2d at 905; See also 1 Newberg on Class Actions § 3.32 at 3-156 (1995). As stated by the Plaintiffs in their Reply brief, "[i]ssues relating to how funds awarded as damages should be distributed across the class can be resolved at the appropriate time." (See Reply, p. 19-20).

25

905 (1990); Shores v. Sklar, 647 F.2d 462 (5th Cir. 1981). The
Plaintiffs also argue that, in any event, individual issues of
reliance are trumped by the substantial number of common questions
of both law and fact that result from the Defendants' fraudulent
common course of conduct.

### Affiliated Ute Presumption

The Weitzmans argue that the Affiliated Ute presumption is
inapplicable here because it only applies in pure "omissions cases."
According to the Weitzmans, this is a case of "mixed"
misrepresentations and omissions to which the Affiliated Ute
presumption does not apply. The Court agrees with Plaintiffs, that
the Weitzmans' restriction of the Affiliated Ute presumption to
cases involving purely omissions is incorrect. The Supreme Court
stated in Affiliated Ute that the presumption of reliance arises in
cases involving "primarily" omissions.[7] The Court interprets this
language as meaning that the presumption of reliance can arise even
if allegations of misrepresentations exist, as long as the case is
based primarily on omissions. The word "primarily," as posed by the
Supreme Court, implies that some misrepresentations are commonplace

_____

[7]Specifically, the Supreme Court noted that:

> Under the circumstances of this case,
> involving primarily a failure to disclose,
> positive proof of reliance is not a
> prerequisite to recovery. All that is
> necessary is that the facts withheld be
> material in the sense that a reasonable
> investor might have considered them important
> in the making of this decision.

Affiliated Ute Citizens of Utah v. United States, 406 U.S. at
153-54.

in omissions cases, but they do not destroy the presumption of reliance if the case is based primarily on the omissions. The Court, however, does agree that the Affiliated Ute presumption is not available in mixed cases involving both omissions and misrepresentations. See Cavalier Carpet, Inc. v. Caylor, 746 F.2d 749, 756 (11th Cir. 1984); See Kirkpatrick v. J.C. Bradford & Co., 827 F.2d at 722; See also In Re Sahlen & Associates, Inc., Securities Litigation, 773 F.Supp. 342, 354 (S.D. Fla. 1991)(Hoeveler, J.)(holding that the Affiliated Ute presumption of reliance does not apply in mixed cases). Thus, the critical question here is whether this is a case involving primarily omissions, or whether this is a mixed case of omissions and misrepresentations.

Upon reviewing the Complaint, depositions and other attachments, the Court finds that this is a case involving primarily omissions. The Court recognizes the fact that Plaintiffs' Complaint alleges that the Defendants made several misrepresentations in furtherance of the Premium fraud. (See Plaintiffs' Complaint, ¶'s 149, 152, 153, 159, 327, 328 and 333). However, it is clear that the crux of this case is the omission of material information alleged throughout the Plaintiffs' Complaint, pleadings and oral argument. The fact that securities claims are based primarily on omissions is evident in the following two (2) paragraphs of Plaintiffs' Complaint:

> 173. The Funding Entities relied and depended on Premium and its principals for the success of their operations. However, the Funding Entity Offering Documents **uniformly omitted to state**

material information regarding the principals of Premium and Plaza, Thenen and Morris, which a reasonable investor would consider to be important in investing in an operation which heavily relied on Thenen and Morris.  In particular, the Funding Entity Offering Documents uniformly failed to disclose:

> (a)  that Thenen and Morris were officers and directors of Poly Glass, which went bankrupt in 1982;
> (b)  that Morris filed personal bankruptcy in March 1982;
> (c)  that Morris was an officer and director of Southern Merchandise, which went bankrupt in 1985;
> (d)  that Thenen was chief operating officer and vice chairman of Syncom, which went bankrupt in 1986; and
> (e)  that Thenen was sued in federal court in Minnesota in connection with allegations of fraud, payment of bribes and kickbacks to Syncom's auditors, which case was settled in 1992.

174. The purpose of the Funding Entity Offerings was to raise money for the Funding Entity diverting transactions arranged by Premium. Nevertheless, the Funding Entity Offering Documents **uniformly failed to disclose**: (a) the substantial probability that the various offerings would be considered integrated thereby exposing the Funding Entities to huge contingent liabilities; (b) material information on the other substantial offerings being used to raise money for Premium, such as the number of investors involved and the size of the various other offerings; (c) that substantial amounts of the proceeds would be used to pay "returns" to earlier investors in the Funding Entities; and (d) that there was no reasonable basis for any substantial returns on the investments in light of the true nature of Premium's business.

(See Plaintiffs' Complaint, ¶'s 173-74).  The Defendants allegedly failed to disclose all of these material facts.

Thus, this case is not like the "mixed cases" of Cavalier, Sahlen and Kirkpatrick, where the "[t]he defendants did not 'stand

28

mute' in the face of a duty to disclose as did the Defendants in _Affiliated Ute_." Huddleston v. Herman & MacClean, 640 F.2d 534, 548 (5th Cir. 1981). In the instant case, the Complaint indicates that the Defendants "stood mute" regarding the true nature of the Ponzi scheme and the checkered pasts of Premium's chief officers, Thenen and Morris. It is this complete silence or nondisclosure that is the key to the Premium fraud, because the Plaintiffs claim that if they had known about Thenen and Morris' background or had they received the requested financial statements, they would have never invested in Premium Sales. As Plaintiffs' securities claims are basically about who is responsible for the omission of these facts, the Court finds that this is primarily an omissions case, and thus, the **Affiliated Ute** presumption of reliance is available to Plaintiffs in this action.

In support of their argument that this is a mixed case not entitled to the Affiliated Ute presumption, the Defendants pointed out at the hearing on Plaintiffs' Motion for Class Certification, that this Court's Order Denying the Defendants' Motions to Dismiss, entered on February 16, 1995, noted that the Plaintiffs relied on misrepresentations and omissions. Walco Investments, Inc. v. Thenen, 881 F. Supp. 1576, 1584 (S.D. Fla. 1995). Defendants, however, failed to point out that the Court's Order specifically noted that the entire Ponzi scheme may not have occurred had the background information regarding Thenen and Morris been disclosed. Id. In pointing out that these omissions were central to the case, the Court noted that:

29

> Most important in this regard is the fact that Defendants allegedly failed to include background information on Mr. Thenen and Mr. Morris that, not only would have alluded investors to their suspect investment schemes, but may have prevented the fraud itself; if investors refused to invest because of the principals involved, no fraudulent scheme whatsoever could have occurred.

Id. As the Court noted above, the presumption of reliance is not limited to pure omissions cases. Therefore, the presumption is not destroyed if there is a mixture of omissions and misrepresentations, as long the case is based primarily on omissions. There are some misrepresentations mixed in with omissions here, but this fact does not preclude the application of the Affiliated Ute presumption of reliance because this case is based primarily on omissions. As stated earlier, the word "primarily" as used by the Court in Affiliated Ute, logically implies that some misrepresentations will exist in omissions cases.

### Fraud-on-the-Market Theory

The Plaintiffs also argue that they are entitled to a class-wide presumption of reliance under the fraud-on-the-market theory because the fraud at issue in this case was the only thing that created the market for the Premium securities. In order for the Shores/Ross presumption of reliance to apply, the Plaintiffs must show that the securities which were not traded on the "open market" could not have been offered on the market at any price but for the fraudulent scheme. Shores v. Sklar, 647 F.2d at 464 n.2; Ross v. Bank South, N.A., 885 F.2d at 729. The Complaint here alleges that, "if the true facts had been disclosed in the various Funding Entity Offerings, neither the Plaintiffs nor any member of the

30

Class would have purchased the securities" in this fraudulent scheme. (See Plaintiffs' Complaint, ¶ 206). In other words, but for the alleged fraudulent activity of the Defendants, there would have been no market for the Premium securities. Thus, the Court finds:

> [T]hat where as here, a complaint alleges that a security not traded on the open market could not have been issued but for the fraud of the defendants, class action treatment is not precluded by the possibility that some purchasers, including the named plaintiffs, might have relied on factors other than the integrity of the market.

Kirkpatrick v. J.C. Bradford & Co., 827 F.2d at 723. Any further inquiry at this time into whether or not Plaintiffs relied on factors other the integrity of the market would be a clear violation of the Eisen doctrine. Id. (finding that the trial court's rejection of the fraud-on-the-market theory violated Eisen because it was improperly based on nothing other than the court's assessment of the plaintiffs' likelihood of success on the claims). In conclusion, for the reasons stated above, the Court finds that Plaintiffs are also entitled to a presumption of reliance based on the fraud-on-the-market theory.[8]

Defendants argued at the hearing held on Plaintiffs' Motion for Class Certification that the fraud-on-the-market presumption of reliance is unavailable to the Plaintiffs because this action is being brought under 10b-5(2), while the presumption is only

---

[8]The Court notes that at trial, if Plaintiffs prove the existence of material omissions (Affiliated Ute) or that adequate disclosure would have made the Premium interests unmarketable at any price (Shores/Ross), reliance will be presumed and the burden will shift to the Defendants to rebut the presumption on a class-wide basis.

available in claims brought under 10b-5(1) and (3).[9]  In _Shores_,
the Court distinguished claims brought under Rule 10b-5(2) in the
primary market context from those brought under Rule 10b-5(1) or
(3), stating that proof of actual reliance is required under
section (2), as liability under this provision is premised directly
upon the misstatements or omissions, while proof of direct reliance
is not required under sections (1) and (3), which are aimed at
broader schemes of securities fraud. _Shores v. Sklar_, 647 F.2d at
469; _See In Re Sahlen & Associates, Inc., Securities Litigation_,
773 F. Supp. at 354.  The _Shores_ court thus refused to apply the
fraud-on-the-market theory to 10b-5(2) cases in the undeveloped,
primary market context.  A review of the Complaint indicates that
Plaintiffs' are _not_ seeking to recover solely for the fraudulent
statements and omissions of Defendants pursuant to section (2).
The Complaint specifically alleges that Plaintiffs are proceeding
under all three subsections of Rule 10b-5. (_See_ Plaintiffs'
Complaint, ¶'s 204-205).  For this reason, the Court rejects the

---

[9]Rule 10b-5 provides in part:

It shall be unlawful for any person, directly or
indirectly, by the use of any means or instrumentality of
interstate commerce, or of the mails,...
(1)  to employ any device, scheme, or artifice to
defraud,
(2)  to make any untrue statement of a material fact or
to omit to state a material fact necessary in order to make the
statements made, in light of the circumstances under which they
were made, not misleading, or
(3)  to engage in any act, practice, or course of
business which operates or would operate as a fraud or deceit
upon any person, in connection with the purchase or sale of any
security.

Defendants' argument and finds that the fraud-on-the-market presumption is available in this case.[10]

## Common Course of Conduct

Finally, Plaintiffs argue that even if they do not have the Affiliated Ute and fraud-on-the-market presumptions, Defendants were involved in a single, common scheme or course of conduct, therefore, any issues of individual reliance **on the securities claims** are dwarfed by common questions of fact and law. As stated earlier, the Complaint here alleges that the Defendants, through their acts and omissions, were engaged in a common course of conduct to defraud the investors. (See Plaintiffs' Complaint, ¶'s 204-205). Thus, in order to succeed under Count III, the Plaintiffs and class members will have to prove the existence of this common fraudulent scheme. As a result of this alleged fraudulent scheme, there are numerous questions of law and fact common to the class with regard to the claims in Counts III through

---

[10]The Supreme Court has endorsed the application of the fraud-on-the-market presumption in the open and developed market. Basic Inc. v. Levinson, 485 U.S. 224 (1988). The Court in Basic, without distinguishing section (2) of Rule 10b-5 from sections (1) and (3), held that "[b]ecause most publicly available information is reflected in market price, an investor's reliance on any public material misrepresentations may be presumed for purposes of a Rule 10b-5 action." Id. The Basic decision has been interpreted as permitting the fraud-on-the-market presumption in section (2) cases where an **open market** is involved. See In Re Sahlen & Associates, Inc., Securities Litigation, 773 F. Supp. at 355-56. However, as noted in Sahlen, it remains unclear whether the Shores court's holding, refusing to apply the fraud-on-the-market theory to 10b-5(2) cases in a **primary market,** such as in this case, remains intact after the Basic decision. Id. at 356. The Court need not address this issue at this time, however, because the Plaintiffs are proceeding under all three subsections of Rule 10b-5.

VII. (<u>See</u> this Order, p. 13). Several courts, when confronted with single, common fraudulent schemes such as the one in the case at hand, have found that common questions predominate and that class certification is appropriate. <u>See</u> <u>Kirkpatrick v. J.C. Bradford & Co.</u>, 827 F.2d at 724-25; <u>Kennedy v. Tallant</u>, 710 F.2d 711, 718 (11th Cir. 1983); <u>CV Reit, Inc. v. Levy</u>, 144 F.R.D. 690, 696 (S.D. Fla. 1992)(Gonzalez, J.); <u>Kreuzfeld, A.G. v. Carnehammar</u>, 138 F.R.D. at 602-03 (Paine, J.).

In the face of this abundance of common issues of both fact and law, Defendants argue that individual questions regarding reliance will predominate the securities claims. The Court is troubled to a certain extent by some of the examples of differing reliance or non-reliance on behalf of certain investors, particularly the events leading to Mr. and Mrs. Margolis' investment which were highlighted on <u>NBC Dateline</u>. However, the Court cannot be swayed into finding that individual questions of reliance predominate by just a few spectacular cases (i.e., "dart throwing), such as the Margolis example or the Courshon example. The existence of a few questions of individual reliance are <u>not</u> sufficient, on balance, to negate the predominance of common issues of fact and law present in this case. "Rule 23 does <u>not</u> require that all the questions of law and fact raised by the dispute be common." <u>Cox v. American Cast Iron Pipe Co.</u>, 784 F.2d at 1557 (emphasis added). On the contrary, Rule 23 just requires common issues to <u>predominate</u>, thereby logically implying that the existence of <u>some</u> individual issues will not destroy common issue

34

predominance. In view of the overwhelming number of common factual and legal issues presented by Plaintiffs' **securities claims in Count III**, the Court finds that questions of law and fact common to the class predominate over any questions affecting only individual members.

The Weitzman Defendants argue that Plaintiffs' "common scheme" allegation is insufficient to establish that common questions of fact and law predominate, because there are numerous factual distinctions among the different Defendants in this case. For example, the Weitzmans argue that "Plaintiffs cannot allege, let alone establish, that the Weitzmans as borrowers of funds could be part of an overall common scheme involving the sale of securities." In addition, the Weitzmans note that unlike the Defendants in cases like CV Reit and Kreuzfeld, the Defendants here are not a "tightly-knit group." According to the Weitzmans, the Defendants in the instant case worked separately and with little or no knowledge of the existence of the other Defendants. The Court notes that it is up to the trier of fact to determine the veracity of these allegations. Delving into these issues at the class certification stage would be a clear violation of the Eisen doctrine.

### RICO and COMMON LAW FRAUD CLAIMS

Counts **VIII** and **IX** of Plaintiffs' Complaint seeks certification of a Global Class to pursue claims for violations of both the federal and Florida RICO statues, against the Insider Defendants, the Confirmer Defendants, the Grocery Defendants and the Banking Defendants. In addition, Plaintiffs' Complaint seeks

certification of a Global Class to prosecute the common law fraud claims contained in Count VII against the Insider Defendants, the Funding Entities and the Promoters, and in Count X against the Banking Defendants, the Grocery Defendants and the Confirmers. Since each of these four Counts presents a fraud-based claim, the Court will deal with them together at this time.

The Defendants that are listed under these Counts are not being sued for securities laws violations. Therefore, Defendants are correct when they state that Plaintiffs cannot "piggyback" these RICO and common law fraud claims with their securities laws claims. As a result, Plaintiffs must establish that common questions predominate as to each of these fraud-based claims. For the reasons stated below, the Court finds that Plaintiffs' fraud based claims in Counts VII, VIII, IX and X are also appropriate for class certification.

Both the Grocer and Banking Defendants filed memoranda in opposition to the certification of these fraud-based claims.[11] Defendants point out that fraud-based claims are inherently unsuitable for class action treatment. Defendants claim that this is so because Plaintiffs typically cannot prove that common issues of law or fact predominate on each element of their fraud-based claims. Defendants generally make two arguments in support of their position that common issues do not predominate: (1)

---

[11]The Grocers oppose certification of Counts VIII, IX and X. While the Banking Defendants oppose certification of the common law fraud claim against them in Count X, they do not oppose class certification of the RICO claims against them in Counts VIII and IX.

individual questions of reliance predominate over common class questions; and (2) that since these claims are based on differing oral misrepresentations, they are inappropriate for class treatment because it is difficult to prove that the same misrepresentations were made to each member of the class.

Similar to the argument made by Defendants against certification of the securities claims, the Defendants here argue that individual questions of reliance presented by Plaintiffs' RICO and common law fraud claims will predominate. Since the Defendants under these Counts are not being sued for securities laws violations, the fraud-on-the-market and Affiliated Ute presumptions of reliance are not available to Plaintiffs here with regard to the RICO and common law fraud claims. However, the Court notes that the "common scheme" or "common course of conduct" argument, made by Plaintiffs in support of the securities claims, is available here with regard to these fraud-based claims.

Throughout Counts VII, VIII, IX and X, Plaintiffs have adequately alleged a common fraudulent scheme and course of conduct by Defendants that led to the filing of these fraud-based claims. (See Plaintiffs' Complaint, Counts VII, VIII, IX and X, p. 68-105). Under the RICO claims, Plaintiffs as well as all the class members will have to prove the existence of a fraudulent scheme whereby the Insiders would transmit false invoices and purchase orders to the Confirmers, and the Confirmers would make false confirmations to the Funding Entities. Similarly, as to the common law fraud claims, Plaintiffs and class members will have to establish the

37

existence of a common fraudulent scheme involving identical material omissions and misrepresentations to all class members. Faced with similar allegations of a single, common ·fraudulent scheme, several courts have certified fraud-based claims such as the ones before this Court. See Rodriguez v. McKinney, 156 F.R.D. 112 (E.D. Pa. 1994)(RICO claim); Heastie v. Community Bank of Greater Peoria, 125 F.R.D. 669 (N.D. Ill. 1989)(RICO claim); Smith v. MCI Telecomm. Corp., 124 F.R.D. 665 (D. Kan. 1989)(RICO and fraud claims); McMahon Books, Inc. v. Willow Grove Assocs., 108 F.R.D. 32, 39 (E.D. Pa. 1985)(RICO claim certified where plaintiffs asserted a single fraudulent scheme); Broin v. Phillip Morris Cos., 641 So.2d 888 (Fla. 3d DCA 1994)(fraud claim).

As a result of these alleged common fraudulent schemes, there exists many questions of law and fact common to the class with regard to the fraud-based claims in Counts VII-X. For example, as to the *common law fraud claims*, the following issues are common to the class:

* Whether the Defendants were all part of the fraudulent scheme;

* Whether the Funding Entities were acting as agents of the Plaintiffs;

* Whether the Defendants knowingly made material misrepresentations and omissions;

* Whether the Defendants were reckless in not knowing of the material omissions;

* Whether the Grocer Defendants and County National Bank can be held vicariously liable; and

* Whether Plaintiffs were damaged by the Defendants' fraudulent course on conduct.

38

With regard to the *RICO claims*, the following issues are common to the class:

* Whether the transactions evidenced by the purchase orders and invoices were false;

* Whether the purchase orders and invoices sent to the various Funding Entities were standardized;

* Whether Kelly Thomas, Mike Flynn and Charlie Valvo knowingly made false confirmations to the Funding Entities;

* Whether the Grocer Defendants and County National Bank can be held vicariously liable.

* Whether Defendants are "persons" within the meaning of the RICO statutes;

* The manner in which the funds that financed the fictitious transactions were routed;

* Whether Defendants engaged in a pattern of racketeering activity through predicate acts of wire fraud;

* Whether Defendants participated in an enterprise within the meaning of the RICO statutes;

* Whether Defendants' activities affected interstate commerce;

* Whether Defendants knowingly received income derived, directly or indirectly, from the pattern of racketeering activity;

* Whether Defendants used or invested any part of such income in the acquisition of any interest in, or the establishment or operation of, any legitimate business enterprise; and

* Whether Defendants participated in the operation and management of the racketeering enterprise itself.

In view of the alleged fraudulent schemes and the corresponding overwhelming number of common factual and legal issues, the Court finds that questions of law and fact common to

the class predominate over any questions affecting only individual members with regard to the **fraud-based claims in Counts VII-X.**

Defendants have also made several other arguments ·in support of their position that common issues do not predominate, including, but not limited to, the following:

* **That Plaintiffs did not know that the Grocers existed;**

* **That the Funding Entities were not the agents of Plaintiffs;**

* **That Plaintiffs did not know what the Funding Entities were doing with regard to ˮconfirmationsˮ;**

* **That Kelly Thomas, Mike Flynn and Charlie Valvo were not acting as agents of Defendants;**

* **That Plaintiffs did not rely on any misrepresentations by Defendants, but instead relied on their friends, relatives, etc.**

* **That Plaintiffs lost their money at the time that it was invested with the Funding Entities, thus the Grocer Defendants could not have caused their alleged loss.**

Although Plaintiffs addressed some of these arguments in their reply brief, the Court is barred by the <u>Eisen</u> doctrine from looking into these matters at this time. Even under the liberal view of <u>Eisen</u> adopted by the Eleventh Circuit, delving into these issues at this stage of the proceedings would be tantamount to an improper examination of the underlying merits of the RICO and common law fraud claims. Specifically, the Court would improperly be assessing Plaintiffs' likelihood of success on these claims. These issues are more appropriately left for determination by the trier of fact.

40

However, the Court will address Defendants' argument that common questions do not predominate under the RICO claims because Plaintiffs cannot demonstrate the existence of and·use of a standardized sales pitch. Plaintiffs' RICO claims in Counts VIII and IX focus on a common scheme of fictitious written purchase orders and invoices and oral confirmations. While identical (i.e., word for word) oral misrepresentations by the Confirmer Defendants may not have been used, the Court accepts, for purposes of this Motion, that these oral misrepresentations were "substantially identical." There may have been different comments made during the confirmations, but from a review of the record there does not seem to be any material or substantial differences in the misrepresentations. Minor differences in misrepresentations are to be expected in a fraudulent scheme that lasted several years and involved numerous transactions and several players, as has been alleged by Plaintiffs in their Complaint. The gist of the confirmations is that they all allegedly falsely confirmed that the fictitious invoices represented actual sales or purchases of products; they all misrepresented or omitted the same material information. Plaintiffs' Complaint lists confirmation upon confirmation where it is consistently alleged that the Confirmer Defendants made false confirmations of nonexistent transactions. (See Plaintiffs' Complaint, ¶'s 267-293). Therefore, there were no substantial variations in the misrepresentations and thus, individual questions of fact do not predominate. Any further inquiry into this matter at this stage would also be a violation of

41

the _Eisen_ doctrine.

## Superiority

In addition to finding that common questions predominate, the Court must also find that a class action is the superior method of adjudicating this dispute. If another available method of handling the controversy seems better suited for a particular action than the class action device, it should not be allowed to proceed under 23(b)(3). _See_ 7A Charles A. Wright, Arthur R. Miller & Mary K. Kane, _Federal Practice and Procedure_: Civil § 1777 at p.519 (1986). The purpose of the superiority requirement is consistent with the overall goals of Rule 23, which is to assure that the class action is the most efficient, effective and economic means of settling the controversy. _Id._ § 1779 at p.562. In considering the superiority issue, subdivision (b)(3) lists four factors that the Court should consider:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

No single element is determinative. Furthermore, this is not meant to be an exhaustive list of the factors that the Court should consider when determining whether to allow a Rule 23(b)(3) class action. _See_ _Buford v. American Finance Company_, 333 F.Supp. 1243, 1250 (N.D. Ga. 1971). Thus, the Court has discretion to consider other factors when making this superiority determination. _Id._

42

A review of the factors listed in subdivision (b)(3) indicates that a class action is the superior method of adjudicating this controversy. First, there are approximately 1,500 class members, none of which seem to have an interest or desire to try their own separate lawsuits. The lack of interest is evidenced by the fact that no other actions have been filed by any of the individual class members. In any event, the Court notes that it would be extremely costly, not to mention unnecessarily duplicative, for a class member to try this action separately. Although it is true that some of the named Plaintiffs have large claims, each and every class member is faced with the obstacle of having to establish the existence of the alleged Premium Ponzi scheme. No matter how sophisticated or wealthy some of the investors may be, this will be a very tedious task, and thus not a simple obstacle to overcome on their own. Therefore, it is understandable for the class members to believe that a class action is the most efficient way for them to obtain a recovery.

Secondly, the fact that there exist no other litigation brought by or against the class or any of its individual members, negates the threat of inconsistent adjudications. As to the desirability of concentrating this action in this forum, the Court notes that certifying this class will prevent the duplication of effort and the possibility of inconsistent results. This action was filed back in 1993 and has been actively litigated in this forum since that time. In addition, although some of the investors are scattered throughout the United States and Canada, many of

43

them, along with many of the witnesses, reside within this District and this Court has already "specially set" this case for trial beginning **October 15, 1996**. Finally, the Court finds that there will be no major difficulties in the management of this case as a class action. There may be some minor difficulties, such as the reliance and causation issues. However, these difficulties are nowhere near the magnitude of problems that will arise if this case were to be tried under several hundred separate trials. Thus, the Court finds that the existence of any individual issues will not make this case unmanageable as a class action. Moreover, the Court notes that the certification of the five (5) subclasses under Counts I and II helps reduce some of the difficulties that may arise in the management of this class action.

Another alternative argument posed by the Grocer Defendants is that the Court deny class certification because the cross-claims asserted by the Funding Entities and the ancillary lawsuit brought by Harley Tropin, Receiver and Trustee of the Premium Companies, are preferable methods to litigate this controversy. They argue that the latter approach is a superior method because any recovery by the Funding Entities and Mr. Tropin will ultimately be for the benefit of the class members. The Court disagrees that this method proposed by the Grocer Defendants is superior to proceeding under a class action because the primary controversy here is between the Plaintiffs and the Defendants. The Court cannot require Plaintiffs to depend on the Funding Entities, who the Plaintiffs have accused of participating in the Premium fraud, in order to

44

obtain a recovery.

II.  <u>SUBCLASSES</u>. In Counts I and II of the Complaint, the
Plaintiffs allege that the Insiders, Funding Entities, General
Partners and Promoters sold securities to Plaintiffs in interstate
commerce without a registration statement and without the use of a
prospectus meeting the requirements of the securities laws, in
violation of Sections 12(1), 12(2) and 15 of the Securities
Exchange Act.  On December 29, 1994, the Court ruled that these
claims under Counts I and II must be pursued through separate
subclasses that correspond to the different Funding Entities. (<u>See</u>
Court's Order Granting Defendants' Motion to Dismiss in Part at p.
9-10).   Therefore, in order to prosecute Counts I and II,
Plaintiffs seek certification of the following five (5) subclasses
against the issuers of the Funding Entity offerings:

1)   Plaintiffs   Walco   Investments,   Inc.,   PHK   Limited
Partnership and Burleigh Corporation seek to represent all members
of the Global Class who bought interests in or otherwise invested
in or through the Deckelbaum Funding Entities (the **"Deckelbaum
Subclass"**);

2)   Plaintiffs Robert E. Shack, Eleanor Shack, Robert E.
Shack, P.A. and Palmer Hughes seek to represent all members of the
Global Class who bought interests in or otherwise invested in or
through the Sazant Funding Entities (the **"Sazant Subclass"**);

3)   Plaintiff Claire Warren seeks to represent all members of
the Global Class who bought interests in or otherwise invested in
or through the Stern/Lipson Funding Entities (the **"Stern/Lipson**

Subclass");

4)    Plaintiff Joe Sklar seeks to represent all members of the Global Class who bought interests in or otherwise invested in or through the Schwartz/Weitzman Funding Entities (the "**Schwartz/Weitzman Subclass**");

5)    Plaintiffs Abraham and Rita Woidislawsky seek to represent all members of the Global Class who bought interests in or otherwise invested in or through the Yuz Funding Entities (the "**Yuz Subclass**").

Under Rule 23(c)(4), <u>each</u> subclass must meet the general prerequisites of Rule 23 in order to be certified. The Court notes that the analysis of the issues above with regard to the Global Class for the most part establishes that the Rule 23 requirements for each of the subclasses are also met. In any event, the Court will briefly address each of Rule 23's prerequisites as they apply to the subclasses:

(i)    **Numerosity**: Each of the subclasses has a minimum of ninety-seven (97) members. In addition, as stated earlier, these individuals are geographically dispersed throughout the United States and Canada. Thus, the Court finds that the subclasses are all sufficiently numerous and geographically diverse to make joinder impracticable.

(ii)    **Commonality, Predominance and Superiority**: The Court also finds that each subclass presents numerous common questions of fact and law which predominate over issues affecting individual subclass members. As to each of the subclasses, there exists a substantial

46

number of common questions of fact and law. These common questions far outweigh any individual issues that may exist within each subclass. The common and predominating issues for each of the subclasses sought to be certified under Counts I and II include, but are not limited to, the following:

- **Whether the interests sold were securities;**

- **Whether the securities should have been registered;**

- **Whether the purportedly separate offerings should be considered as being integrated;**

- **Whether the "private offering" exemption applies; and**

- **Whether the offering documents omitted material information regarding Premium and its principals.**

In addition to finding that the commonality and predominance requirements are met, the Court also finds that prosecution by the respective subclasses of Counts I and II is superior to other available methods for the fair and efficient adjudication of the controversy. It would be highly inefficient and extremely costly to try the Section 12 claims individually several hundred times.

(iii) **Typicality and Adequacy:** Finally, the Court notes that each subclass has at least one proposed representative who has been harmed by the same course of conduct which harmed the other members of that particular subclass. Thus, the claims of each subclass representative are typical of the claims of the subclass members. Moreover, the Court finds that the subclass representatives do not have any interests antagonistic to those of the subclass members. On the contrary, since they were harmed pursuant to the same course of conduct alleged in Counts I and II, the representatives and the

47

subclass members share the common objective of establishing Defendants' liability and maximizing the recovery. Therefore, each of the proposed subclass representatives will adequately protect the interests of the subclass members.

The Court notes that the only opposition to certification of the subclasses under Counts I and II comes from the Weitzman Defendants. Specifically, the Weitzmans argue that they did not sell or offer to sell the Plaintiffs any "securities," and that therefore the Plaintiffs cannot adequately represent the class members under the securities claims in Counts I-VI. The Court notes that such factual disputes must be determined at the trial on the merits.

## CONCLUSION

For the reasons stated above, it is

ADJUDGED that Plaintiffs' Motion for Class Certification is GRANTED. Therefore, the Court hereby certifies the Global Class of investors to prosecute Counts III, IV, V, VI, VII, VIII, IX and X, as well as the five (5) subclasses to prosecute Counts I and II.

## NOTICE TO CLASS MEMBERS

Having certified the Global Class as well as the five (5) subclasses under subdivision (b)(3), the Court must now direct notice to all members of the class regarding the institution of this class action. Rule 23(c)(2) states that:

> In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be

> identified through reasonable effort.  The notice shall
> advise each member that **(A)** the court will exclude the
> member from the class if the member so requests by a
> specified date; **(B)** the judgment, whether favorable or
> not, will include all members who do not request
> exclusion; and **(C)** any member who does not request
> exclusion may, if the member desires, enter an appearance
> through counsel.

The Court is thus obligated to make sure that the class members
receive the best notice possible, which includes the specific
matters listed in Rule 23(c)(2).  In order to ensure that the best
notice practicable is sent to the class members, the Court hereby
directs the Plaintiffs to submit a proposed "<u>Notice of Pendency of
Class Action</u>" for the Court's review no later than <u>**July 10, 1996**</u>.
Defendants are free to file objections to Plaintiffs' proposed
Notice no later than <u>**July 22, 1996**</u>.


DONE AND ORDERED in Chambers at Miami, Florida, this 27th day
of May, 1996.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE


copies to be provided by the Receiver to:
All counsel listed on the June 17, 1996 service list.

49